1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN CRAIG GENTRY, | Case No. 1:12-cv-01825-SKO |
| Plaintiff, | **ORDER REGARDING PLAINTIFF'S COMPLAINT** |
| v. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

_____/

## I.    INTRODUCTION

Plaintiff Jonathan Craig Gentry ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. § 1383(c).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.

## II.    FACTUAL BACKGROUND

Plaintiff was born on October 1, 1958.  (Administrative Record ("AR") 128.)    Plaintiff obtained a GED after completing the eleventh grade so he could serve in the United States Navy. (47, 345.)  Plaintiff served in the Navy from 1976 until 1977, when he was honorably discharged.

(*See* AR 242.)  Plaintiff struggled with alcoholism as a teenager and attempted suicide when he was 16.  (AR 238, 323.)  Plaintiff stopped drinking alcohol in his early twenties, but used amphetamines until 2008; he has remained drug-free since then.  (AR 238, 345.)  Plaintiff was incarcerated for fourteen months until April 2008 and was incarcerated again in 2009 for a brief period.  (AR 323.)  On May 1, 2009, Plaintiff filed an application for SSI, asserting he was disabled due to crippling arthritis of the spine, borderline diabetes, anxiety and panic attacks, and recurring cancer.  (AR 156.)

## A.    Relevant Medical Evidence[1]

Don M. Endress, M.D., has been Plaintiff's treating physician since at least 2005, but no records indicate that Plaintiff saw Dr. Endress for a mental health condition in 2005.  (*See* AR 256-58.)

In January 2008, while incarcerated, Plaintiff sought mental health treatment.  (AR 242.)  Plaintiff's appearance, behavior, orientation, speech, affect, cognition, and thought process were all within normal limits.  (AR 243.)  Plaintiff's mood was noted as slightly anxious, and he reported trouble sleeping.  (AR 243.)  He was assigned a Global Assessment of Functioning ("GAF") score of 65.  (AR 244.)[2]

In September 2008, after release from prison, Plaintiff sought treatment from Dr. Endress for an annual physical.  (AR 253.)  No mental health complaints were noted.  In October 2008, Plaintiff was again seen by Dr. Endress for a wart removal.  (AR 252.)  On November 12, 2008, Plaintiff saw Dr. Endress and reported difficulty sleeping.  (AR 250.)  Dr. Endress noted insomnia with "defin[ite] psych issues."  (AR 250.)  He prescribed Prilosec and Trazedone.  (AR 250.)  In December 2008, Plaintiff reported improvement of his insomnia after the start of Trazedone, but

---

[1] Although all the medical evidence has been considered, only the evidence relevant to Plaintiff's arguments has been summarized in this order.

[2] The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  *Am. Psychiatric Ass'n*, Diagnosis & Statistical Manual of Mental Disorders, Text Revision ("DSM-VI-TR") 32 (4th ed. 2000).  The clinician uses a scale of zero to 100 to consider "psychological, social, and occupational functioning on a hypothetical continuum of mental health- illness," not including impairments in functioning due to physical or environmental limitations.  *Id.* at 34.  A GAF score between 61 and 70 indicates mild symptoms or some difficulty in social, occupational, or school functioning.  *Id.*

no mental health symptoms or issues were noted.  (AR 249.)  On January 23, 2009, Plaintiff was examined by Dr. Endress to follow-up on blood work and insomnia, but no mental health issues or symptoms were noted.  (AR 248.)

On February 18, 2009, during another period of incarceration, Plaintiff was diagnosed with an anxiety disorder not otherwise specified, and amphetamine abuse by history.  (AR 232.)  He was assigned a GAF score of 71.[3]  (AR 232.)  Plaintiff indicated he had mild anxiety, but that most of his anxiety was situational.  (AR 236.)

On March 30, 2009, after release from custody, Plaintiff saw Dr. Endress.  (AR 246.)  Dr. Endress noted Plaintiff was returning to his office after another period of incarceration, and he had not been taking his blood pressure medication.  (AR 246.)  Plaintiff reported he was experiencing sudden back and leg pain, and he had pain with deep inspiration and a cough.  (AR 246.)  Plaintiff also indicated he had been having nose bleeds, and in the past he had cancer of the nose that was perhaps not properly treated.  (AR 246.)  On examination, Plaintiff's head, ears, eyes, throat, neck, lungs, back, heart, abdomen, and upper and lower extremity extension were all within normal limits.  His nose showed inflammation, but no lesion was seen.  (AR 246.)

On April 14, 2009, Plaintiff was seen by Dr. Endress to follow-up on the results of previous blood work and for blood pressure control.  (AR 245.)  The examination indicated Plaintiff's functioning was within normal limits, and his hypertension was doing well with medication. (AR 245.)  No mental health symptoms or treatment was noted.  (AR 245.)

On June 5, 2009, Plaintiff again saw Dr. Endress who noted Plaintiff had chronic back pain and anger control issues.  (AR 295.)  Dr. Endress prescribed Plaintiff a trial package of Lexapro for his anger issues.  (AR 295.)

On July 3, 2009, Plaintiff again sought treatment from Dr. Endress.  (AR 293.)  He indicated Plaintiff had been gaining weight and his stomach was becoming distended, making breathing difficult.  (AR 293.)  Dr. Endress noted an impression of Hepatitis C and likely ascites[4]

---

[3] A GAF score of 71 represents no more than slight impairment in social, occupational, or school functioning.  DSM-IV-TR at 34.

[4] Ascites refers to effusion and accumulation of serous fluid in the abdominal cavity.  *Dorland's Illustrated Medical Dictionary* 164 (31st ed. 2007).

1  related to liver disease.  He reported he would work at getting Plaintiff a consultation with a

2  gastroenterologist.  (AR 293.)

3      On July 14, 2009, Plaintiff was examined by state agency physician Miguel Hernandez,

4  M.D.  (AR 273-77.)  Plaintiff reported a history of anxiety and panic attacks for the four previous

5  months, which he believed were getting worse.  (AR 273.)  Upon examination, Dr. Hernandez

6  provided a physical functional assessment indicating Plaintiff could stand and walk up to six hours

7  in an eight-hour workday with routine breaks; sit up to six hours in an eight-hour workday with

8  routine breaks; lift and carry up to 50 pounds occasionally, and 25 pounds frequently; but could

9  only occasionally climb, balance, stoop, kneel, crouch, and crawl due to chronic degenerative disc

10  disease of the lumbar spine.  (AR 276-77.)

11      On July 16, 2009, Plaintiff again followed-up with Dr. Endress regarding his abdomen.

12  (AR 292.)  Plaintiff reported continued pain and diarrhea, but his breathing was not affected.

13  (AR 292.)  Dr. Endress noted an impression of Hepatitis C with chronic diarrhea.  (AR 292.)  He

14  also indicated Plaintiff was awaiting a consultation with a gastroenterologist, and Dr. Endress

15  would "push harder for someone to see this [patient] ASAP."  (AR 292.)

16      On July 20, 2009, state-agency psychologist, Paul R. Martin, Ph.D., examined Plaintiff.

17  (AR 278-81.)  Dr. Martin diagnosed Plaintiff with moderate and recurrent major depressive

18  disorder; panic disorder without agoraphobia; panic disorder due to both a general medical

19  condition and psychological factors; opioid dependence in full sustained remission; and

20  amphetamine dependence in full sustained remission.  (AR 280.)  Dr. Martin opined that Plaintiff

21  was moderately limited in his ability to maintain adequate pace or persistence to perform complex

22  tasks; withstand the stress of a routine workday; and interact appropriately with co-workers,

23  supervisors, and the public on a regular basis.  (AR 280.)  Dr. Martin opined that Plaintiff was

24  mildly limited in his ability to maintain adequate attention and concentration; adapt to changes in

25  job routine; and adapt to changes, hazards or stressors in the workplace.  (AR 280.)  Dr. Martin

26  further opined that Plaintiff was unimpaired in his ability to follow simple instructions; follow

27  complex or detailed instructions; maintain adequate pace or persistence to perform one- or two-

28  step simple, repetitive tasks; and manage his funds.  (AR 280.)

4

On September 3, 2009, non-examining state agency psychologist, Robert Liss, Ph.D., completed a mental residual functional capacity assessment and opined Plaintiff is moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; and interact appropriately with the general public. (AR 309-10.)  Dr. Liss concluded that Plaintiff is able to perform simple, repetitive tasks on a sustained basis; adapt to work changes; and interact with people, but with limited public contact.  (AR 311.)

On October 9, 2009, Plaintiff was seen at Stanislaus County Behavioral Health, seeking to have his medication evaluated as he did not feel it was working.  (AR 325.)  Plaintiff stated Dr. Endress had diagnosed him with bipolar disorder in May 2009 and had prescribed Zyprexa. (AR 325.)  Plaintiff reported symptoms of depressed mood, insomnia, fatigue, poor concentration, and quick mood shifts that lead to verbal and physical outbursts.  (AR 325.)  He reported Hepatitis C, brain cancer, and chronic pain.  (AR 326.)  The practitioner assigned a GAF score of 52,[5] and Plaintiff was referred to Lyle B. Forehand, Jr. M.D., also at Stanislaus County Behavior Health. (AR 323, 328.)

On October 28, 2009, Dr. Forehand saw Plaintiff for a one-time psychopharmacology consultation, which was reported to Dr. Endress.  (AR 323.)  Dr. Forehand diagnosed Plaintiff with anxiety disorder, not otherwise specified (subsyndromal chronic post-traumatic stress disorder) as well as single episode and moderate major depressive disorder, and he prescribed Plaintiff medication.  (AR 32-24.)  Dr. Forehand indicated it was difficult to make a diagnosis for post-traumatic stress disorder ("PTSD") because there was no documented or recalled trauma. (AR 324.)   Nevertheless, he indicated that there were significant reasons to make a PTSD diagnosis including that it may be the only way to effectively treat Plaintiff's psychopathology, there is no other likely explanation for a 13-year hole in Plaintiff's memory, and Plaintiff's presentation was most consistent with Dr. Forehand's experience of patients with PTSD. (AR 324.)  Dr. Forehand recommended the use of Lamotrigine, which is a mood stabilizer that did not carry the same risks as Zyprexa, which Plaintiff was currently prescribed.  (AR 324.)  Dr.

---

[5] A GAF score of 52 represents moderate symptoms or moderate difficulty in social, occupation, or school functioning.  DSM-IV-TR at 24.

1  Forehand noted that Plaintiff indicated an interest in psychotherapy or psychotherapeutic groups,

2  and Dr. Forehand supported Plaintiff's participation in such groups.  (AR 324.)

3       On November 8, 2009, Plaintiff was again examined by Dr. Endress, who noted Plaintiff

4  was following-up on his "girth and his depression."  (AR 334.)  Dr. Endress indicated that Plaintiff

5  had been seen by "psych" one time, and recommendations were in his chart.  (AR 334.)  He

6  reported an impression of Hepatitis C with increasing abdominal girth and chronic diarrhea.  He

7  also indicated Plaintiff had experienced weight gain on the Zyprexa prescribed to treat his

8  depression/bipolar disorder and the psychiatric recommendation from Dr. Forehand was to "drop"

9  the Zyprexa and start Lamictal.  (AR 334.)  Dr. Endress indicated he would prescribe as suggested

10 by Dr. Forehand and see Plaintiff back in four weeks.  (AR 334.)

11      On December 23, 2009, Dr. Endress noted Plaintiff had bipolar disorder with borderline

12 control on his current medications.  (AR 333.)  The Lamictal starter pack was noted to be well

13 tolerated by Plaintiff and his mood was "much better."  (AR 333.)  Dr. Endress noted that

14 Plaintiff's insurance status was changing soon, and Plaintiff would not be able to afford many of

15 his medications.  On February 8, 2010, Dr. Endress again examined Plaintiff, who had lost his

16 health insurance.  (AR 332.)  Due to an inability to ingest the medication he had been prescribed,

17 Plaintiff was placed back on Zyprexa for what Dr. Endress diagnosed as bipolar disorder.[6]  On

18 February 25, 2010, Plaintiff was again seen by Dr. Endress who noted Plaintiff's bipolar disorder

19 had improved since he started taking Zyprexa.  (AR 330.)

20      On March 10, 2010, A. Garcia, M.D., reviewed Plaintiff's records and affirmed Dr. Liss'

21 opinion that Plaintiff could complete simple, repetitive tasks with limited public contact.

22 (AR 335.)

23      On November 5, 2010, examining physician, Les P. Kalman, M.D., Psy.D., examined

24 Plaintiff.  (AR 344.)  Dr. Kalman diagnosed Plaintiff with major depression; PTSD; amphetamine

25 dependence in sustained full remission; antisocial personality disorder; Hepatitis C; degenerative

26 disc disease in the lower back; and chronic pain.  (AR 346.)  Dr. Kalman opined that Plaintiff's

27

28 [6] The record indicates Plaintiff was taking Seroquel to treat his bipolar disorder, which he could no longer swallow
due to throat swelling.  (AR 332.)

1    condition was not expected to improve significantly within twelve months.  (AR 346.)  Dr.

2    Kalman found Plaintiff was mildly limited in his ability to maintain attention and concentration

3    for extended periods of time and respond appropriately to changes in the workplace.  (AR 351-52.)

4    Dr. Kalman further opined Plaintiff was moderately limited in his ability to understand, remember,

5    and carry out detailed instructions; work in coordination with or proximity to others without being

6    distracted by them; complete a normal workweek without an unreasonable number and length of

7    rests; ask simple questions or ask for assistance; and get along with co-workers or peers.  He also

8    found Plaintiff markedly limited in his ability to accept instructions and respond appropriately to

9    criticism from supervisors.  (AR 351-52.)  Dr. Kalman concluded that Plaintiff was incapable of

10   tolerating even low work-related stress.  (AR 354.)

11   **B.        Third-Party Testimony**

12            On May 14, 2009, Plaintiff's wife, Cindy Gentry, completed a third-party function report.

13   (AR 172.)   Ms. Gentry stated she has known Plaintiff for twenty-four years, and spends

14   approximately twenty to twenty-four hours a day with him.  (AR 172.)  Plaintiff wakes up at 5:00

15   in the morning, makes coffee, wakes their son, takes him to school, and picks up their son from

16   school.  On good days Plaintiff will help Ms. Gentry with household chores, but on days he is

17   "stressing," he will stay in his room in the dark.  (AR 172.)  Plaintiff used to be able to lift heavy

18   objects and bend but no longer can do so. He wakes up with back pain or headaches nightly.

19   (AR 173.)   At times Ms. Gentry must remind Plaintiff whether he has taken his medication.

20   (AR 174.)   Normally, Plaintiff and Ms. Gentry prepare meals together, and Plaintiff prepares

21   meals daily.   (AR 174.)   Plaintiff helps with light housework that does not require lengthy

22   amounts of time, bending, or standing.  (AR 174.)  Plaintiff shops for groceries and household

23   items once a month for approximately one hour.  (AR 175.)  Plaintiff is able to pay bills, count

24   change, handle a savings account, and use a checkbook/money orders.  (AR 175.)  Plaintiff's

25   hobbies and interests include watching television, rebuilding computers, and drawing.  (AR 176.)

26   Plaintiff does not have any interest in things he once enjoyed doing.  (AR 176.)  Plaintiff talks on

27   the phone to family members approximately once a week, goes to events at their son's school

28   approximately once a month, and visits family members approximately once a month.  (AR 176.)

Plaintiff has no social interest outside of his immediate family.  (AR 176.)  Plaintiff's condition affects lifting, bending, standing, walking, kneeling, stair climbing, completing tasks, and his concentration.  (AR 177.)  Plaintiff can no longer build fences or perform any job that requires concentration because he becomes easily agitated.  (AR 177.)  He can walk for about two blocks before needing to rest for approximately five minutes.  (AR 177.)  Plaintiff does not finish what he starts and has to read written instructions several times.  (AR 177.)  His ability to follow spoken instructions is better on some days than others, and Plaintiff has difficulty getting along with authority figures.  (AR 178.)  He becomes angry easily and "the smallest problem will set him in a rage" or will cause him to stay in bed for days.  (AR 178.)  He gets upset if there are any changes in his routine, and he experiences mood swings.  (AR 178.)  Plaintiff was a methamphetamine user for approximately thirty-six years, but has not used drugs for ten months.  (AR 179.)  His wife has asked him to seek counseling for his mood swings, and he now takes prescribed medication for anxiety, blood pressure, back pain, and headaches, along with medication to help him sleep. (AR 179.)

**C.     Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 71, 75-79, 80-82.)  On December 20, 2010, the ALJ held a hearing.  (AR 43-66.)  Plaintiff testified, through the assistance of counsel, and a vocational expert provided testimony.  (AR 43-66.)

**1.     Plaintiff's Hearing Testimony**

Plaintiff testified that he received his GED after completing eleventh grade so that he could join the service.  (AR 47.)  He worked forty to sixty hours a week for twelve years as a foreman for a fencing company and has not worked since 1997.  (AR 48.)  His job at the fencing company sometimes required heavy lifting of up to one-hundred pounds.  (AR 48.)

With respect to his physical problems, Plaintiff testified his lower back bothers him because of a work-related injury that occurred when he was a stock clerk.  (AR 50.)  He feels fatigued and smokes about half a pack of cigarettes a day.  (AR 50-51.)   Plaintiff does not currently drink alcohol or use any kind of illegal drugs; he is currently on parole for violating his

1   probation after spending fourteen months in prison for writing bad checks.  (AR 52.)

2   　　　　With respect to his mental health, Plaintiff has been diagnosed with bipolar and manic

3   depression.  (AR 54.)  He sometimes wakes up in a complete rage for no reason; sometimes he

4   will wake up and cry; other times he will not get out of bed for a week.  (AR 55.)  He is currently

5   on medication which causes him chronic diarrhea.  (AR 55.)  Plaintiff is rarely able to leave his

6   house because of the diarrhea.  (AR 55.)

7   　　　　Plaintiff lives with his wife and his 19-year-old son.  (AR 56.)  When he is home and

8   feeling "okay," he watches television for about four hours.  (AR 56.)  Plaintiff uses a computer to

9   do online banking and also to check his email account.  (AR 56.)  He drives a couple times a week

10  to the grocery store, and occasionally he will go to an Alcoholics Anonymous ("AA") meeting.

11  (AR 57.)  Plaintiff has not used methamphetamine for two years, eight months, and four days, and

12  has been sober for thirty-six years; yet, occasionally he goes to the AA meetings to "touch base"

13  and help people who need assistance.  (AR 58.)

14  　　　　Plaintiff's wife provides the sole source of household income through her unemployment

15  compensation.  (AR 59.)  He occasionally helps his wife cook dinner, and stays away from

16  physical household chores because of his health problems.  (AR 59-60.)  Plaintiff cannot lift

17  clothes to do the laundry or lift groceries; he indicated that showering is "becoming a problem"

18  because bending over to clean his lower extremities is getting difficult.  (AR 60.)  He can sit for

19  about twenty minutes before his lower back hurts and his knees and legs go numb, and can stand

20  for about ten or fifteen minutes before needing to sit or lay down.  (AR 60-61.)

21  　　　　In regard to Plaintiff's ability to concentrate, he has difficulty focusing; when he is

22  watching television, he finds himself losing track of the plot at least once a day.  (AR 61.)

23  　　　　**2.**　　　**Vocational Expert's Hearing Testimony**

24  　　　　A vocational expert ("VE") testified that Plaintiff's past work as a fence builder is heavy[7]

25  and skilled.  (AR 62.)  The ALJ posed two hypotheticals for the VE to consider.  The ALJ asked

26  the VE to consider a hypothetical person of the same age and education as Plaintiff and with the

27
_____

28  [7] "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing
    up to 50 pounds.  If someone can do heavy work, [the Commissioner determines] that he or she can also do medium,
    light, and sedentary work."  20 C.F.R. § 416.967(d).

1  same work history and types of transferrable skills who could sit for six hours but stand and/or

2  walk less than two hours each in a normal workday; only occasionally lift and/or carry less than 10

3  pounds; could never climb, balance, stoop, kneel, crouch, crawl, or work around hazards; and

4  would need numerous unscheduled rest breaks more frequently than would normally be allowed.

5  (AR 63.)   The ALJ also added that this hypothetical person would not have the ability to

6  concentrate on even simple, routine tasks.  (AR 63.)  The VE testified there would be no full-time

7  work that an individual with these limitations could perform.  (AR 63.)

8        In a second hypothetical, the ALJ asked the VE to consider a person with the same

9  education and work history as Plaintiff, but who was limited to six hours of sitting, standing, and

10  walking with normal breaks; carrying 50 pounds occasionally, and 25 pounds frequently;

11  occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and jobs involving

12  only simple, routine tasks with occasional public contact.  (AR 64.)   The VE testified that such an

13  individual could not perform Plaintiff's past relevant work, but there was other work Plaintiff

14  could perform such as that of a hand packer, a kitchen helper, and a linen room attendant.

15  (AR 64.)

16        Plaintiff's counsel posed a hypothetical to the VE, asking the VE to assume a person with

17  the same limitations as in the second hypothetical presented by the ALJ, but modified such that the

18  person could have no public contact and could not perform simple, repetitive tasks due to

19  concentration issues.  (AR 65.)  The VE testified that such a person could not perform any of the

20  alternative work identified by the VE in response to the ALJ's second hypothetical.  (AR 65.)

21    **3.    ALJ's Decision**

22        On January 20, 2011, the ALJ issued a decision finding Plaintiff not disabled.  (AR 24-37.)

23  The ALJ determined Plaintiff has the Residual Functional Capacity ("RFC")[8] to perform medium

24  work, but is limited to occasional climbing, balancing, stooping, kneeling crouching, and

---

25  
26  [8] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an
27  individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and
28  'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

crawling. (AR 29.) Plaintiff is limited to siting, standing, and walking for six hours each during an eight-hour workday with normal breaks; he can lift and carry 50 pounds occasionally, and 25 pounds frequently; and he can work at jobs requiring simple, routine tasks with only occasional public contact. (AR 29.) The ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since the date the application was filed; (2) has the following severe impairments or combination of impairments: degenerative disc disease, obesity, hepatitis C, depression, and anxiety; (3) does not have an impairment or combination of impairments that meets or medically equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A or B; (4) is unable to perform any past relevant work as a fence builder; but (5) can perform work that exists in significant numbers in the national economy. (AR 26-37.)

Plaintiff sought review of the ALJ's decision before the Appeals Council. (AR 19.) On September 11, 2012, the Appeals Council denied review. (AR 1-3.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481.

**D.      Plaintiff's Contention on Appeal**

On November 6, 2012, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. Plaintiff contends that the ALJ erred by (1) improperly evaluating the medical evidence in determining his mental RFC; (2) failing to state clear and convincing reasons for finding Plaintiff not fully credible; and (3) failing to give legally sufficient reasons for rejecting Ms. Gentry's lay testimony.

### III.   SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v.*

*Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v.*

*Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.    APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to

engage in any substantial, gainful activity by reason of any medically determinable physical or

mental impairment that can be expected to result in death or that has lasted, or can be expected to

last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or

impairments must result from anatomical, physiological, or psychological abnormalities that are

demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

such severity that the claimant is not only unable to do his previous work, but cannot, considering

his age, education, and work experience, engage in any other kind of substantial, gainful work that

exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential

analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine

whether the claimant is currently engaged in substantial gainful activity.     20 C.F.R.

§§ 404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the

claimant has a severe impairment or a combination of impairments significantly limiting her from

performing basic work activities.   20 C.F.R. §§ 404.1520(c), 416.920(c). If so, in the Third Step,

the ALJ must determine whether the claimant has a severe impairment or combination of

impairments that meets or equals the requirements of the Listing of Impairments ("Listing"),

20 C.F.R. 404, Subpart P, App. 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If not, in the Fourth

Step, the ALJ must determine whether the claimant has sufficient residual functional capacity

1   despite the impairment or various limitations to perform her past work. 20 C.F.R. §§ 404.1520(f),

2   416.920(f).  If not, in Step Five, the burden shifts to the Commissioner to show that the claimant

3   can perform other work that exists in significant numbers in the national economy.  20 C.F.R. §§

4   404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the

5   sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99

6   (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

7                                **V.   DISCUSSION**

8   **A.      The ALJ's Assessment of Plaintiff's Credibility**

9             Plaintiff asserts that the ALJ failed to state clear and convincing reasons for discrediting

10  Plaintiff's testimony regarding the severity of his impairments.  The Commissioner contends the

11  ALJ provided legally sufficient reasons for rejecting Plaintiff's statements about the extent,

12  severity, and limiting effects of his impairments.

13            In   evaluating   the   credibility   of   a   claimant's   testimony   regarding   subjective

14  symptomatology, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586,

15  591 (9th Cir. 2009).  The ALJ must first determine whether the claimant has presented objective

16  medical evidence of an underlying impairment that could reasonably be expected to produce the

17  pain or other symptoms alleged.  *Id.*  The claimant is not required to show that her impairment

18  "could reasonably be expected to cause the severity of the symptom she has alleged; she need only

19  show   that   it   could   reasonably   have   caused   some   degree   of   the   symptom."   *Id.* (quoting

20  *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of

21  malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms

22  if he gives "specific, clear and convincing reasons" for the rejection.  *Id.*  As the Ninth Circuit has

23  explained:

24                 The ALJ may consider many factors in weighing a claimant's credibility, including
                   (1) ordinary techniques of credibility evaluation, such as the claimant's reputation
25                 for  lying,  prior  inconsistent  statements  concerning  the  symptoms,  and  other
                   testimony  by  the  claimant  that  appears  less  than  candid;  (2)  unexplained  or
26                 inadequately explained failure to seek treatment or to follow a prescribed course of
                   treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported
27                 by substantial evidence, the court may not engage in second-guessing.

28

                                           13

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929.  Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

Here, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms was not credible to the extent not adopted in the ALJ's RFC assessment.  (AR 32.)  The ALJ made no finding that Plaintiff was malingering.  Therefore, the ALJ's basis for rejecting Plaintiff's lay testimony regarding his subjective symptoms must be clear and convincing.  *Lingenfelter*, 504 F.3d at 1036.

**1.** **Plaintiff's Testimony Regarding His Chronic Diarrhea Symptoms Was Properly Considered**

The ALJ considered Plaintiff's allegations regarding the limiting effects of his chronic diarrhea.  (AR 32.)  Plaintiff testified he experiences chronic diarrhea as a side effect of his medications, and he is hardly able to leave his house because of it.  (AR 55.)  The ALJ determined that Plaintiff's diarrhea symptoms were not disabling.  The ALJ noted that medical evidence indicated the condition was associated with Plaintiff's Hepatitis C, rather than a side effect of medication.  The ALJ reasoned that the medical records showed few complaints regarding this condition, and there was no objective medical evidence establishing the condition had any more than a minimal impact on Plaintiff's ability to perform work related activities for 12 continuous months.  (AR 33.)  Thus, the ALJ concluded the medical evidence did not support Plaintiff's allegations that he is unable to work due to symptoms related to his chronic diarrhea.

Plaintiff argues research shows that chronic diarrhea may be disabling and even life threatening.  (Doc. 14, 21:2-4.)  According to Plaintiff, research also shows that Hepatitis C can cause both diarrhea and a distended abdomen, symptoms Plaintiff reported to Dr. Endress in May and July 2009.  (Doc. 14, 21:5-8.)  In November 2009, Plaintiff continued to complain of diarrhea,

1   and Dr. Endress again diagnosed chronic diarrhea.  Plaintiff contends there are few treatment

2   records following November 2009 because he lost his insurance.   Nevertheless, the record

3   establishes his diarrhea continued at least until November 2010, which is consistent with Plaintiff's

4   testimony at his hearing in December 2010.  Plaintiff maintains there is no evidence that his

5   diarrhea ever resolved, and the ALJ erred in rejecting Plaintiff's statements on the ground the

6   medical evidence does not support that Plaintiff is unable to work due to experiencing chronic

7   diarrhea.

8       The Commissioner responds that Plaintiff's medical records show few complaints with

9   respect to diarrhea, there is no objective medical evidence to show the condition would impose

10  more than a minimal limitation on his ability to perform work-related activities for twelve months,

11  and Plaintiff admitted that Dr. Endress' treatment notes after November 2009 refer only to

12  insomnia and a viral illness, not diarrhea.  (Doc. 15, 13:4-12.)

13      In assessing credibility, an ALJ may properly consider a claimant's failure to request

14  treatment for a condition claimed to cause disabling symptoms.  *See Meanel v. Apfel*, 172 F.3d

15  1111, 1114 (9th Cir. 1999) (testimony that claimant experienced pain approaching highest level

16  possible inconsistent with minimal treatment).   The record supports the ALJ's reasoning that

17  Plaintiff's treatment records show few complaints regarding diarrhea.  (AR 33.)  Plaintiff reported

18  diarrhea and a distended stomach to Dr. Endress in May and July 2009 and again in November

19  2009.  However, in August and September 2009 when Plaintiff saw Dr. Endress, no complaints of

20  diarrhea were reported.  (AR 290-91.)  While Plaintiff complained of diarrhea again in November

21  2009, Dr. Endress noted that Plaintiff had an appointment at the end of that week with a

22  gastroenterologist; when Plaintiff returned to see Dr. Endress in December 2009, Plaintiff did not

23  complain of diarrhea symptoms.   (AR 333.)   Although Plaintiff contends there are no other

24  complaints of diarrhea after November 2009 because he lost his health insurance, Plaintiff did

25  seek medical care after November 2009 despite his insurance status; treatment records dated

26  December 2009 and February 2010 do not contain any reference to complaints of diarrhea and

27  only note insomnia and a viral illness.  (AR 330, 332.)

28

15

1    Based on Dr. Kalman's examination, Plaintiff also contends the medical records show his

2    diarrhea continued until at least November 2010.   Dr. Kalman's November 2010 report noted

3    chronic diarrhea as part of Plaintiff's medical history, and that Plaintiff was afraid to leave the

4    house much because of it, but Dr. Kalman did not diagnose chronic diarrhea even though he

5    diagnosed other physical conditions.  (*See* AR 344-47.)

6    Finally, Plaintiff's May 2009 functional report does not discuss any symptoms or

7    limitations resulting from his diarrhea.  That there were few medically documented complaints of

8    diarrhea, and none to Dr. Endress after November 2009 despite treatment in December 2009 and

9    February 2010, was a clear and convincing basis for the ALJ to reject Plaintiff's hearing testimony

10   that he was suffering from severe symptoms of diarrhea such that he was unable to leave the house

11   or go out in public.   Further, there is a lack of medical evidence showing that the condition caused

12   disabling limitations expected to last more than 12 months which, in conjunction with the

13   relatively few complaints made by Plaintiff to his treating physician about the condition, was a

14   legally sufficient basis for the ALJ to reject Plaintiff's testimony.  *See Rollins v. Massanari*,

15   261 F.3d 853, 857 (9th Cir. 2001) (while medical evidence alone cannot discredit testimony as to

16   subjective symptoms, it is one factor which the ALJ is permitted to consider).

17          **2.      Testimony of Fatigue Symptoms**

18   Plaintiff contends the ALJ failed to provide legally sufficient reasons to discredit his

19   testimony regarding fatigue.  (Doc. 14, 21:15-20.)  Plaintiff testified at the hearing he "get[s]

20   fatigued, short wind[ed]," which prevents him from working.  (AR 50.)  The ALJ rejected his

21   complaints of fatigue because "there is no evidence on the record that shows that the claimant

22   experiences a disabling level of fatigue."  (AR 33.)

23   Plaintiff argues that fatigue is the most commonly reported symptom of Hepatitis C, and he

24   reported fatigue to Dr. Martin, indicating that he had to stay home all day and rest.  According to

25   Plaintiff, his fatigue is supported by the record.

26   The ALJ did not conclude that Plaintiff does not suffer from any fatigue, but that there is

27   no evidence that the extent of the fatigue he suffers is disabling.  While there may not be medical

28   evidence that corroborates Plaintiff's fatigue or its extent, this is not a reason, by itself to rejected

Plaintiff's subjective statements.   Nevertheless, the lack of evidence in the record regarding Plaintiff's fatigue is inconsistent with Plaintiff's claim of disabling fatigue.  Fatigue was not noted by Plaintiff in his functional report as a problem or limitation.  (*See* AR 164-71.)   Plaintiff reported to Dr. Martin that he had "poor energy" (AR 278), and Dr. Kalman indicated Plaintiff had decreased energy (AR 349), but Plaintiff did not report fatigue to his primary care physician, and no physician opined that Plaintiff's fatigue would preclude him from working or limited him in a significant respect.   Even accepting Plaintiff's statement that he suffers fatigue, there is no evidence to show the extent of Plaintiff's fatigue or how it precludes him from working.  The ALJ did not err in finding that the record does not support that Plaintiff's fatigue is not disabling.

### 3.      The ALJ Failed to State Clear and Convincing Reasons to Reject Plaintiff's Testimony Regarding His Psychiatric Symptoms

Plaintiff claims the ALJ did not offer clear and convincing reasons for rejecting Plaintiff's statements about the extent of his psychiatric symptoms.  (Doc. 14, 22:17-23:12.)

The ALJ rejected Plaintiff's contention that his psychiatric symptoms prevent him from working.   (AR 33.)   First, the ALJ reasoned that Plaintiff did not seek out mental health counseling once he was released from prison and only received conservative pharmaceutical treatment for his impairments.   Second, during his mental consultative examination with Dr. Martin, he demonstrated adequate memory, attention, concentration and intellect.   Third, in 2010, Dr. Endress noted improvement of Plaintiff's symptoms with medication.   Finally, the ALJ generally concluded the medical evidence did not support Plaintiff's allegations that he experiences a disabling level of psychiatric symptoms.  (AR 33.)

### a.      Lack of Mental Health Counseling Is Not a Clear and Convincing Reason to Disregard Plaintiff's Lay Statements

Plaintiff argues he sought mental health *treatment* in 2009, and the ALJ's determination in this regard was factually inaccurate. The Court notes the ALJ did not state that Plaintiff sought no

mental health *treatment*; rather, the ALJ found that Plaintiff failed to seek mental health *counseling* after his release from prison. (AR 33.)[9]

Plaintiff sought mental health treatment, as opposed to mental health counseling, relatively soon after his release from prison.  During an unspecified period of incarceration in early 2009, Plaintiff's prison medical chronology records indicate he was diagnosed with an anxiety disorder and assigned a GAF score of 71 on February 18, 2009.  (AR 232.)  Plaintiff was released from custody sometime after that report was generated, and on March 30, 2009, he saw Dr. Endress for leg and back pain as well as a cough.  (AR 246.)   While the records from Dr. Endress do not document any mental health treatment in May 2009, in October 2009 Dr. Forehand noted Plaintiff was taking Zyprexa as prescribed by Dr. Endress in May 2009.  Dr. Forehand sent his findings regarding Plaintiff's mental condition to Dr. Endress, which Dr. Endress reviewed and commented upon.  This is evidence that Dr. Endress had been treating Plaintiff for mental health symptoms as early as May 2009.  Moreover, on June 5, 2009, Plaintiff reported anger control issues to Dr. Endress who prescribed a trial of Lexapro.  (AR 295.)  The record evidences no substantial lapse between Plaintiff's diagnosis of a mental disorder and his attempt to seek some type of mental health treatment after his release from custody.

Further, although Plaintiff did not seek mental health *counseling* immediately after his release from prison, he did express an interest to Dr. Forehand in participating in psychotherapy. While there is no evidence Plaintiff participated in psychotherapy or counseling, there is also no indication that mental health counseling was available to Plaintiff or that Plaintiff was offered counseling but refused to participate.  It is unclear how Plaintiff's failure to obtain counseling reflects on his credibility when he was otherwise seeking medical treatment for his mental condition.   Plaintiff's lack of mental health counseling therefore does not constitute a clear and convincing reason to discredit his testimony regarding the extent of his psychiatric symptoms.

---

[9] Nevertheless, the ALJ's finding in this regard is somewhat ambiguous.  It is not clear whether the ALJ meant Plaintiff *never* sought mental health counseling after his release from prison, or that he did not seek mental health counseling *immediately* after his release from prison.

#### b.       Plaintiff's Mental Health Treatment Was Not Necessarily Conservative

The ALJ also noted that Plaintiff's testimony about his psychiatric symptoms was not entirely credible because he underwent only conservative pharmaceutical treatment.  Evidence of "conservative treatment" is a legally sufficient basis to discount a claimant's testimony regarding the severity of an impairment.  *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007).  There is no evidence, however, that Plaintiff's prescription medication in this case was conservative.  In *Parra*, the Ninth Circuit affirmed the ALJ's adverse credibility finding on the ground that Plaintiff's conservative treatment consisting of over-the-counter medication was inconsistent with his testimony about pain.  *Id.*  Prescription medication such as Zyprexa, however, is not conservative in the same manner as over-the-counter pain relievers at issue in *Parra*.

Also, "[t]he fact that treatment may be routine or conservative is not a basis for finding subjective symptom testimony unreliable absent discussion of the additional, more aggressive treatment options the ALJ believes are available."  *Slover v. Comm'r of Soc. Sec. Admin.*, No. CV-10-258-HZ, 2011 WL 1299615, at * 4 (D. Or. Apr. 4, 2011).  While Dr. Forehand stated he "heartily support[ed Plaintiff's] participation" in psychotherapy, it is not clear that such treatment is more aggressive than prescription medication, or that psychotherapy was available to Plaintiff and he simply refused to participate in it.  Under these circumstances, conservative treatment is not an adequate basis to reject Plaintiff's testimony.

#### c.       Improvement in Plaintiff's Condition Was Not a Clear and Convincing Basis to Reject Plaintiff's Lay Testimony

Plaintiff also argues the improvement in his condition noted by the ALJ is founded on an isolated February 2010 report of Dr. Endress, and does not establish that Plaintiff's psychiatric condition improved for more than this brief snapshot of time.  The Commissioner argues that improvement with medication is an adequate basis to reject Plaintiff's statements about his psychiatric limitations.  (Doc. 15, 12:25-13:3.)

The Court agrees with Plaintiff.  The fact that Dr. Endress found Plaintiff's symptoms had improved on Zyprexa at Plaintiff's February 2010 examination is not a clear and convincing basis to reject Plaintiff's statements.  This single notation represents a discrete and potentially isolated

1  period of improvement, particularly because in November 2010 Dr. Kalmad assessed Plaintiff

2  with a GAF score of 50, which represents serious impairment in functioning.  (AR 346.)  While

3  the ALJ rejected Dr. Kalmad's opinion, that rejection itself was based in part on the improvement

4  noted by Dr. Endress in February 2010.[10]   The ALJ's reasoning does not constitute a clear and

5  convincing basis to discredit Plaintiff's statement regarding his symptoms.  *See Punzio v. Astrue*,

6  630 F.3d 704, 710 (7th Cir. 2011) ("a person who suffers from a mental illness will have better

7  days and worse days, so a snapshot of any single moment says little about her overall condition").

8              **d.      Functioning at Plaintiff's Mental Status Examination**

9              As an additional basis for rejecting Plaintiff's statements regarding his psychiatric

10  symptoms, the ALJ noted that Plaintiff exhibited adequate memory, attention, concentration, and

11  intellect during his psychiatric consultative examination with Dr. Martin.  (AR 33.)    This is

12  essentially a finding that the medical evidence does not support Plaintiff's testimony as to the

13  degree of his subjective symptoms.  This cannot be the sole basis to reject a claimant's testimony

14  about the subjective nature of his limitations and impairments.  *See Byrnes v. Shalala*, 60 F.3d

15  639, 642 (9th Cir. 1995) (lack of corroborating medical evidence cannot form the sole basis to

16  reject subjective complaints).  Because the ALJ's other reasons for rejecting Plaintiff's statements

17  are not clear and convincing, this reason, standing alone, is not a legally sufficient basis to reject

18  Plaintiff's statements about his psychiatric symptoms.

19              **4.      Conclusion**

20              While the ALJ clearly and convincingly rejected some of Plaintiff's subjective testimony,

21  the ALJ did not state legally sufficient reasons to reject Plaintiff's testimony about his psychiatric

22  condition and limitations.

23  **B.      The ALJ's Consideration of the Medical Evidence**

24              **1.      Applicable Law**

25              The medical opinions of three types of medical sources are recognized in Social Security

26  cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not

27  treat the claimant (examining physicians); and (3) those who neither examine nor treat the

28  _____

[10]  The ALJ's rejection of Dr. Kalmad's opinion was not legally sufficient, as discussed below.

claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id.* Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions. *Id.* If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

> **2.     The ALJ Failed to State Specific and Legitimate Reasons to Reject Portions of Dr. Martin's Opinion**

Plaintiff argues the ALJ gave no reasons for rejecting Dr. Martin's opinion that Plaintiff was moderately limited in his ability to interact appropriately with co-workers and supervisors. Plaintiff also contends the ALJ failed to state any reasons for rejecting Dr. Martin's opinion that Plaintiff was moderately limited in his ability to "withstand the stress of a routine workday," and instead indicated that Plaintiff had only mild limitations in the ability to adapt to stressors in the workplace setting. (Doc. 14, 16:19-17:5.)

The Commissioner asserts that the limitations opined by Dr. Martin as to Plaintiff's ability to interact with co-workers and supervisors in a work setting were findings that merely characterized Plaintiff's limitations, and the ALJ properly translated these limitations into concrete restrictions in formulating the RFC. The Commissioner cites *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) noting the appellate court determined an RFC for simple tasks properly encapsulated a claimant's mental limitation, including a limitation on pace and concentration. (Doc. 15, 9:5-21.) In other words, the RFC for limited public contact the ALJ

assessed here adequately captured Plaintiff's limited ability to interact with co-workers and supervisors. The Commissioner further contends that, as it pertains to a limitation in Plaintiff's ability to adapt to stressors in the workplace, Plaintiff is incorrect that Dr. Martin found Plaintiff moderately limited in this regard.

Dr. Martin performed a comprehensive examination, and provided the following opinions as to Plaintiff's work-related abilities and his level of impairment:

| **Work-Related Abilities** | **Level of Impairment** |
|---|---|
| 1) Ability to follow simple instructions: …………………………… | Unimpaired |
| 2) Ability to follow complex/detailed Instructions: …………………………………………………….. | Unimpaired |
| 3) Ability to maintain adequate pace or persistence to perform | |
|    a) One or two step simple repetitive tasks: ……………... | Unimpaired |
|    b) Complex tasks: ………………………………………… | Moderately impaired |
| 4) Ability to maintain adequate attention/concentration: ………. | Mildly impaired |
| 5) Ability to adapt to changes in job routine: …………………… | Mildly impaired |
| 6) Ability to withstand the stress of a routine workday: ………... | Moderately impaired |
| 7) Ability to interact appropriately with co-workers, supervisors, and the public on a regular basis: ……………….. | Moderately impaired |
| 8) Ability to adapt to changes, hazards, or stressors in a workplace setting: ………………………………………… | Mildly impaired |
| 9) Is he able to manage his funds: ……………………………….. | Yes. |

(AR 280.) The ALJ found Dr. Martin's opinion that Plaintiff was unimpaired in his ability to (1) follow simple instructions, (2) follow complex and detailed instructions, or (3) maintain adequate pace or persistence to be internally inconsistent with his opinion that Plaintiff was moderately impaired in the ability to maintain adequate pace or persistence to perform complex tasks. The ALJ also found this portion of Dr. Martin's opinion inconsistent with the record, which shows Plaintiff experiences difficulty completing complex tasks due to his psychiatric symptoms. (AR 34.) Thus, this portion of the opinion was discredited, but the remainder of the opinion was given substantial probative weight. (AR 34.)

               **a.**      **Plaintiff's Limited Ability to Interact with Co-workers and Supervisors**

Plaintiff argues the ALJ credited Dr. Martin's opinion that Plaintiff was limited in his ability to interact appropriately with co-workers and supervisors, but this limitation was not

1  incorporated into Plaintiff's RFC.  Plaintiff contends that, in failing to incorporate this limitation,

2  the ALJ rejected Dr. Martin's opinion in this regard without a legal basis for doing so.

3       The Commissioner relies on *Stubbs-Danielson* and asserts this limitation was somehow

4  accounted for in the ALJ's RFC.  This reasoning, however, is unpersuasive.  In *Stubbs-Danielson*,

5  the ALJ determined the claimant retained the RFC to perform simple, routine, repetitive sedentary

6  work, requiring no interaction with the public.  539 F.3d at 1173.  The claimant argued this RFC

7  did not capture the deficiency in pace and other mental limitations identified by various doctors.

8  *Id.*  The court rejected this argument, finding that the ALJ had translated the claimant's condition,

9  including the pace and mental limitations, into the only concrete restriction available – a

10  restriction for simple, repetitive tasks.  *Id.* At 1173-74.

11       Unlike *Danielson-Stubbs*, a limited ability to interact with supervisors and co-workers is

12  conducive to the formulation of a concrete restriction in the RFC in the same way the ALJ created

13  a restriction in the RFC accounting for Plaintiff's limited ability to have contact with the public.

14  For example, in *White v. Astrue*, No. 10-cv-1176-BR, 2012 WL 171001, at *8 (D. Or. Jan. 20,

15  2012), a physician found the claimant to be markedly limited in her ability to work in coordination

16  with or proximity to others without being distracted by them and in her ability to accept

17  instructions and respond appropriately to criticism from supervisors.  The ALJ RFC's assessment

18  captured these limitations by restricting the claimant to no interaction with the general public and

19  only superficial interaction with co-workers and supervisors.  Factually, this case shows that there

20  are meaningful, concrete RFC restrictions that can account for limitations in the ability to interact

21  with co-workers and supervisors.[11]

22       This case is also distinguishable from *Stubbs-Danielson* in that the limitation for simple,

23  repetitive tasks in that case, which the court determined captured a limitation in the abilities to

24  concentrate and keep pace, bore a logical nexus to the limitations at issue.  Simple and repetitive

25  tasks become rote, and are less likely to require much concentration or require critical thinking

26  such that pace would be interrupted.  In contrast, here, none of the limitations in the RFC bear any

27  nexus to limitations in the ability to have contact with co-workers and supervisors.  For example,

28

[11] The ALJ's RFC assessment was found lacking in other areas, but there was no error found with these restrictions.

1    in *Sackett v. Colvin*, No. C12-5353-TSZ-JPD, 2013 WL 1966156, at \*7-8 (W.D. Wash. Apr. 9,

2    2013), the claimant's physician found that he was limited in his ability to interact with co-workers

3    and supervisors, but that limitation was not incorporated by the ALJ into the RFC, despite that the

4    ALJ had credited the opinion of the physician.  The Commissioner argued that this limitation was

5    captured by limiting the plaintiff to work with no more than four-step repetitive tasks, visual

6    instruction, and superficial and occasional contact with the public.  The court rejected this

7    argument, noting that Plaintiff's limitation to four-step tasks was related to his difficulties learning

8    new tasks, and was not relevant to a limitation to contact with co-workers and supervisors.  The

9    court concluded that the limitation on contact with supervisors and co-workers should have been

10   included in the RFC separately.  The same is true in this case: Plaintiff's limited ability to interact

11   with co-workers or supervisors, as opined by Dr. Martin and credited by the ALJ, should have

12   been incorporated into the RFC and the hypotheticals posed to the VE to the extent the limitations

13   were credited by the ALJ.  Further, the limitation on public contact that the ALJ incorporated into

14   the RFC here does not subsume a limitation on interactions with co-workers and supervisors.

15        For these reasons, the ALJ erred in failing to address Plaintiff's limitations in interacting

16   with co-workers and supervisors.  On remand, the ALJ must either set forth reasons why this

17   portion of Dr. Martin's opinion was rejected or include the limitations in Plaintiff's RFC and solicit

18   testimony from a VE regarding whether an individual with such limitations can perform work

19   available in the economy.

20             **b.        Limitations in Plaintiff's Ability to Adapt to Stress**

21        Plaintiff argues the ALJ failed to give any reason for rejecting Dr. Martin's opinion that

22   Plaintiff was moderately limited in his ability to withstand the stress of a routine workday.  The

23   Commissioner contends the ALJ found Plaintiff was only mildly limited in his ability to withstand

24   the stress of a routine workday.

25        The dispute between the parties emphasizes the apparent inconsistency in Dr. Martin's

26   opinion as it relates to Plaintiff's ability to handle stress.  While Dr. Martin opined that Plaintiff

27   was moderately impaired in his "ability to withstand the stress of a routine workday," Dr. Martin

28   also found that Plaintiff was only mildly impaired in his "ability to adapt to changes, hazards, or

1   stressors in the workplace setting." (AR 280.)  The ALJ noted that Dr. Martin found Plaintiff was

2   <u>mildly</u> impaired in his ability to adapt to changes, hazards, or stressors in a workplace setting.

3   (AR 34.)  That accurately characterizes Dr. Martin's opinion.  Nonetheless, there is no discussion

4   how Dr. Martin simultaneously concluded that Plaintiff was <u>moderately</u> impaired in his ability to

5   withstand the stress of a routine workday.  (AR 34, 280.)  It is not clear how this apparent conflict

6   in Dr. Martin's opinion was resolved.  Because Dr. Martin's opinion will be given renewed

7   consideration on remand, the ALJ shall also consider whether these portions of Dr. Martin's

8   opinion are inconsistent and resolve any conflict in the evidence.

9          **3.      The ALJ's Consideration of Dr. Kalman's Opinion**

10         Dr. Kalman examined Plaintiff in November 2010.  (AR 344-47.)  He found Plaintiff to be

11  a fair historian, and noted Plaintiff was the source of information for the report.  (AR 344.)  On

12  examination, Plaintiff was alert and oriented to person, place, date, and situation; his abstractions

13  were intact; his insight and judgment were fair; his mood was depressed and irritable; his affect

14  was restricted; his thought was logical and goal directed; and there were no auditory or visual

15  hallucinations reported.  (AR 345.)

16         Based on his examination, Dr. Kalman opined that Plaintiff is mildly limited in his ability

17  to maintain attention and concentration for extended periods, respond appropriately to changes in

18  the work setting, set realistic goals, and make plans independently.  (AR 351-53.)  He also opined

19  that Plaintiff is moderately limited in the ability to understand, remember, and carry out detailed

20  instructions, work in coordination with or proximity to others without being distracted by them,

21  complete a normal workweek without psychological interruptions, interact appropriately with the

22  public, and get along with coworkers or peers without distracting them or exhibiting behavioral

23  extremes.  (AR 351-52.)  Dr. Kalman opined that Plaintiff is markedly limited in the ability to

24  accept instructions and respond appropriately to criticism from supervisors.  (AR 352.)

25         The ALJ gave portions of Dr. Kalman's opinion reduced weight, explaining that it was

26  inconsistent with Plaintiff's treating record which showed only conservative treatment for

27  Plaintiff's mental impairments, limited counseling for his psychiatric symptoms, and reported

28  improvement on certain medications.  The ALJ also noted the opinion was based heavily on

1   Plaintiff's subjective complaints and not on objective signs and symptoms.  (AR 35.)

2          The reasons for rejecting Dr. Kalman's opinion overlap with the reasons the ALJ provided

3   for rejecting Plaintiff's statements about his psychiatric symptoms.  For the reasons discussed

4   above, the Court finds the ALJ's rejection of Dr. Kalman's opinion legally insufficient.  There is

5   nothing to establish the medication prescribed by Dr. Endress constitutes "conservative" treatment

6   of Plaintiff's mental health symptoms.  To the extent mental health counseling is considered a less

7   conservative treatment modality than prescription medication, Plaintiff expressed an interest in

8   participating in psychotherapy to his physician.  The fact that Plaintiff did not actually undergo

9   mental health counseling says very little about Plaintiff's condition when there is no evidence that

10  Plaintiff refused to participate in counseling or that such a treatment modality was available to

11  him, particularly after 2010 when he became uninsured.  The reported improvement in Plaintiff's

12  symptoms noted by Dr. Endress in February 2010 is an isolated report and, by itself, is not a basis

13  to reject Dr. Kalmad's opinion.  Finally, because Plaintiff's subjective testimony regarding his

14  psychiatric symptoms was not properly rejected, the ALJ's refusal to credit Dr. Kalman's opinion

15  because it was based on Plaintiff's subjective reports is not legitimate.  *See Tommasetti v. Astrue*,

16  533 F.3d 1035, 1041 (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion if it is

17  based 'to a large extent' on a claimant's self-reports that have been *properly* discounted as

18  incredible" (emphasis added)).

19          **4.      Opinions of the Non-Examining Physicians**

20          Plaintiff contends the ALJ erred in assigning weight to the state agency non-examining

21  psychiatric consultants.  Plaintiff contends that the non-examining sources did not have the

22  opportunity to review either Dr. Forehand's or Dr. Kalman's opinions, and therefore the

23  consultants did not have the entire record to review when they assessed Plaintiff's mental

24  impairments.  (Doc. 14, 19:8-20:2.)

25          The Commissioner asserts that the opinions of non-examining state agency psychologists

26  Dr. Liss and Dr. Garcia constituted substantial evidence in support of the ALJ's decision.  (Doc.

27  15, 8:4-9:4.)  The Commissioner notes the ALJ found Dr. Liss' opinion consistent with Plaintiff's

28  performance during his consultative examination and the objective medical evidence and therefore

1   properly ascribed it probative weight.  (Doc. 15, 8:20-22.)  Further, Dr. Garcia reviewed the record

2   on March 10, 2010, which was after Dr. Forehand's examination of Plaintiff, and agreed with Dr.

3   Liss' opinion.

4          The ALJ gave probative weight to the opinions of Drs. Liss and Garcia in part because

5   they were consistent with Plaintiff's performance during his consultative examination with Dr.

6   Martin, which the ALJ credited in large part.  (AR 34-35.)  The opinions of the consultative

7   examiners was consistent with other evidence in the record – specifically, the opinion of Dr.

8   Martin.  However, Dr. Martin's opinion diverged from the opinions of Drs. Liss and Garcia in a

9   significant respect.  Dr. Martin opined that Plaintiff is moderately limited in his ability to interact

10  with co-workers, supervisors, and the general public.  (AR 280.) Dr. Liss, on the other hand,

11  opined that Plaintiff would be moderately limited in his ability to interact with the general public,

12  but would be only mildly limited with respect to interaction with co-workers or supervisors.

13  (AR 310.)   Dr. Garcia indicated his agreement with Dr. Liss that Plaintiff would be limited in his

14  ability to work with the general public, and noted no limitation with respect to interaction with

15  supervisors or co-workers.   (AR 335).   As discussed above, because the ALJ will undertake

16  renewed consideration of Dr. Martin's opinion as it pertains to Plaintiff's limitation in interacting

17  with co-workers and supervisors, the ALJ will also be required to reconsider the opinions of the

18  state-agency physicians in this regard.  While the opinions of non-examining physicians constitute

19  substantial evidence where they are supported by other evidence in the record (*Tonapetyan v.*

20  *Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)), including evidence from an examining physician,

21  there is some discrepancy among the opinions with regard to Plaintiff's limitations on interactions

22  with co-workers and supervisors that must be addressed on remand.

23  **C.      Third Party Testimony**

24         As the medical evidence will be given renewed consideration on remand, reconsideration

25  of Ms. Gentry's testimony, which was rejected in part due to its inconsistency with the medical

26  evidence, may be warranted.  Thus, the Court declines to address Plaintiff's argument that the ALJ

27  improperly rejected Ms. Gentry's lay testimony.

28

## VI.    CONCLUSION

After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with this order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.


IT IS SO ORDERED.

Dated:   **November 25, 2013**                    **/s/ Sheila K. Oberto**
                                        UNITED STATES MAGISTRATE JUDGE